Just so you know, because this is an audio hookup, rather than a video hookup, we have here, in addition to myself, we have Judge Bimey, and we have Judge Malway, who is sitting with us by designation. And then, on behalf of Aloe Vera, we also have Mr. Wilson and Mr. Vaughn. And the timing, I understand, Mr. Wilson, is you intend to take five minutes? Ten minutes? Ten minutes, Your Honor. Okay. And so, is tomorrow beginning the rebuttal? Yes, Your Honor. All right. You may proceed. Thank you. So, in the loop that they saw in the parties, there are two sets of plaintiffs there, and I represent Aloe Vera of America, and Mr. Vaughn represents Young Gossip Speeches. But my argument in chief is that we'll vote the other half of all the speeches, and Mr. Vaughn, I reserve five minutes for Mr. Vaughn to rebuttal, which that's the way we're going to handle it. I'd like to start out by resolving some of the issues on appeal and perhaps answering some potential questions. And, again, these clarifications are on behalf of all plaintiffs with the consent of Mr. Vaughn. Plaintiffs do not argue that they are entitled to punitive damages without a predicate award of actual damages, as given the circuit's guidance in the construction of 7431 and the city DDs. Further, plaintiffs do not urge that the court focus on the two holding companies that are involved in this case and their potential status as independent taxpayers. These companies are merely pass-through entities for the owners of Forever Living Products Japan, Rexpon, and G. Yamagata, to whom any actual damages would flow to. The issues I've just taken off the table are Issues 2 and 3 in the governance agreement. And you're still saying that the holding companies, if only statutory damages are awarded, should get a new individual? No, we're just trying to make the case as simple as possible. After 18 years of litigation, that's when it can be difficult. Further, plaintiffs no longer argue that the burden of proof on factual causation should be shifted to the government to defend it for its future in this manner. As a matter of fact, plaintiffs welcome the effort of proving factual causation by a simple or mere preponderance or probability of the case. The evidence, based on the preponderance of the evidence, that fought for the IRS violation of Section 7431, which was the making of a null and false statement by the IRS to the National Tax Administration, that the simultaneous exam would not have occurred. Further, I think it's important to look at what is not an issue in this appeal. The government, in its briefs at the end, asked the circuit to affirm the trial court's award of statutory damages. That award of statutory damages is premised on, again, the IRS violation of Section 7431 by making a null and false statement to the NTA. That violation is succeeded by the government in the other brief. So the real problem you have is the causation problem. That was the district court's side of the story. That is absolutely correct, Your Honor. And when you read the decision, it's going your way. It is. In every paragraph. It is. Until you get to the end. Until we get to the last couple of pages. I agree with that, Your Honor. What is the telephone responsibility? Do you think the findings are clearly erroneous? I'll do that. So, when we look at the complete evidence and record, what we're asking you to find is that it's a breach of firm and definite conviction that a mistake has been made. And it's a clear error standard. And there are basically three concluded parts that we think occurred in this case. One, that the court's findings were internally inconsistent. Two, that some of the court's conclusions were facially implausible. And three, an uncertain matters. The court failed to enumerate, really, the rationale for its conclusions. So, in the end, this is a but-for analysis, right? On contextual causation. But, or not, but for the tortious act of the government, the lawful state. That the damages would not have occurred. Usually, a but-for analysis is done in the context of intellectual construction or counterfactual construction. You have to decide if you had a parallel reality without a false statement, and a parallel reality with a false statement. What would have happened? Adversity never occurs. However, in Alabama, we have a real-life sample of these parallel realities. In January, I'm going to stay within the four-part snippet. I'm not going to go to the evidentiary record. I'm just going to look at how the district court and Judge Tielberg characterized these documents. In January 1995, the IRS wrote a letter to the National Tax Administration. And that letter did a couple things. It requested assistance to help the IRS district counsel prepare for a tax court case. Let me just remind you, you have only three minutes left, and we don't know which findings are internally inconsistent or implausible. So, I'm just going to remind you of your time. Okay. So, the court characterized the contents of the document as three prime areas. Bad facts, hidden commissions, and avoiding taxes. Those were the three elements. It also suggested that Japan had an interest in these tax issues. In the simultaneous exam proposal, on the same page of the opinion, on page 31 of Judge Tielberg's opinion, he talks about the details of Rexit 1 and what genome has, the outcome structure, and says the three elements, the three key elements are the same. Bad facts, hidden commissions, and deferred taxes. In his words, the only significant difference between the 95 letter and the 96 letter would have been the unreported income false statement of $32,160,000. Well, the documents really have different purposes. The 1995 letter sought assistance from Japan. The 1996 proposal suggested let's coordinate and do something in concert. So, you know, if there were different reactions, why couldn't that be attributed to the different goals of the two documents? Thank you. However, in this instance, there was a request for assistance, which didn't happen. And there was a suggestion, based on these three elements, that Japan really had an interest in disallowing these commissions and getting additional taxes. It did not propose this on its own page, in my understanding. But, again, this is a rare situation where we have, if you will, a similar document in the course of returns, a similar document which got no response in the 96 proposal, which, with the addition of the false statement, got an immediate response. The other internal inconsistency is, and there are a number, but the, oh, pardon me. Judge Kubrick determined in the 95 and 96 analysis that at a minimum it was plausible that one thing caused the exam and another thing caused the exam. Plausible versus plausible. To me, that is at least evidentiary equivalent. If that's true, then to meet a preponderance of the evidence test, all plaintiffs have to do is add one feather. The trick to this here is the scales of justice. If you have the scales of justice equal evidentiary equivalence, then you add a feather, then plaintiffs do win. One of the feathers that we have is Smith, the author of the simultaneous exam proposal, who made the $32 million false statement, said that that number, the $32 million, wouldn't get to entice the NTA into accepting the proposal. Yes, you're now down just four minutes. You've taken up a minute of your colleague's time, so that's between the two of you. I understand, Your Honor. The internal inconsistency. So you don't want to give him a four-minute rebuttal? I'm going to leave him to it. All right. That was our fallback. Okay. Internal inconsistency is in two places in Judge Steelberg's opinion. He connects up the $32 million, $32,116,000, in unreported income in the U.S. to the same amounts which are proposed disallowance to the NTA of commissions and royalty. The $23 million and the $9 million figures? Yes, Your Honor. Although that's first split up in the commission and the royalty amounts. Right. And then, again, he makes that connection. He's concerned when he's talking about whether the statement was false. He had a footnote, and he says, he's presenting a proper argument. It says, no, these are the exactly the same amounts, and they're tied together. They are component pieces. And then when he gets to factual causation, he simply walks away from it. He doesn't make that connection exactly. He disconnects the components. So I am going to leave it for two and a half minutes for rebuttal. Thank you, Your Honor. Thank you. Shall I begin at any point? You may proceed. Thank you very much. This is Karen Gregory on behalf of the United States of America. This final stage of this long-stabbing litigation involves only claims for actual damages, and it's a straightforward statutory construction case at this point. And all of the issues that Mr. Wolfson just raised, I should say, they can, for the most part, be resolved by looking at the language of the statute. But just the point on the internal consistency, what he's doing is he's conflating the district court's analysis of whether the unreported income statement was Mr. Yamagata's return information with the proof of causation element, which is something completely different. He's also attempting to expand the definition of the unreported income statement. The unreported income statement, literally, appears as a proof of page six of the simultaneous examination proposal, and that's on page 622 of the Excerpt of Record, Volume 4. And as the district court gladly asserts, that information does not identify to which taxpayer it relates. On page one of this document, certain taxpayers are identified, and three of them are plaintiffs here, Mr. and Mrs. Maughan, and Alavare of America, but Mr. Yamagata was not the subject, individually the subject of the examination. But he was mentioned in the body of the document. However, there was a statement in there that Mr. Yamagata had been reporting his income correctly. So the district court went through this lengthy analysis to connect Mr. Yamagata to the unreported income statement, and that is one discrete part of this opinion. And that is relevant to Subsection A of Section 7431, which limits a plaintiff in an action against the United States to a taxpayer whose return information has been improperly disclosed by an employee of the United States. The causation provision appears in Subsection C, which is where damages are provided. And that section says, upon a finding of liability on the part of the defendant, and here the only defendant was the United States, and the only liability staff was for the unreported income statement, and then in the next page it says, upon a finding of liability, the plaintiff may seek actual damages sustained by the plaintiff as a result of such unauthorized disclosure. So the only basis on which any of these plaintiffs can seek actual damages under Section 7431 is for the unrecorded income statement. That was the only unauthorized disclosure for which the United States was liable. They are arguing, however, that they are entitled to actual damages based on the disclosure to the Japanese media that was not made by an IRS employee. If you look at the structure of Subsection A, which identifies who the proper defendant is, you see that Congress intentionally did not impose any of those liabilities against the United States for a disclosure by someone else. And this Court correctly describes the structure of the statute in its opinion as a diminutive of the United States, where it held that Section 7431 punishes the United States for disclosure. That's the word that appears here, and appears in the damages section, Subsection C, and does not damage the United States for subsequent dissemination. So the internal consistency is non-existent because the Court was construing two different things. It has to determine whether Yamagata essentially was the proper plaintiff, whether the unreported income statement was his return information, and that's a separate analysis. But then Mr. Yamagata, as well as Mr. Vaughn and Alabama's American agents, essentially Mr. Moss, Alter Ego, Holy M. Goats Corporation, they each of them have to prove under Subsection C in the claim language of the statute that they sustained actual damages as a result of the unreported income statement. And all of their damage claims are derivative of stories in the Japanese media for which the IRS was not responsible, the IRS didn't speak to the Japanese media, but stories in the Japanese media affected the Japanese company. The United States is not liable for that disclosure under the claim language of the statute. What they're trying to do is take the tale of wagging the dog in Japan and pin it on the United States, and Section 7431 does not allow that. So that's the internal inconsistency is not in fact true internal consistency. Separate issues are being addressed by the district court. And as we've explained in our brief, the probation analysis here is extremely attenuated. Their argument is that but for the unreported income statement, there would have been no final case examination acceptance by the NTA. The NTA would not have examined FLPK's return, and then would not have issued press and notices, and then there would have been no stories in the Japanese media all over a year-and-a-half period. This is not the type of situation that is unequivocally fit, that unequivocally fits within the language that Congress chose in Section 7431. The structure of Subsection A, which identifies when the United States can be a defendant, and then the language in Subsection C, which says the United States can only be liable upon a finding of liability and only for that specific disclosure, presents the award of damages that are substantive. The district court's subcourt cognition analysis, which by definition is not clearly around the N, although this court published instructions for a jury in the civil case, in this case the judge was required back, and the analysis there is whether it is more likely true or not true that the facts alleged by the plaintiff have been proven. And the district court directly found that even crediting their argument, which based on speculation elicited under aggressive questioning by Mr. Alamogaddo's counsel, Mr. Smith acknowledged that it was possible that the unimportant income statement could have caught the Japanese's attention, but he didn't testify to that as a fact. On re-examination, he said it never came up. No one ever asked. And another important thing about the 1995 letter is that despite the fact, first of all, it did not propose a final plaintiff's examination, therefore the fact that it did not result in one is meaningless, and there is no evidence of lipidism at all about that letter. That letter was not even mentioned in the 200-plus spokesman of the district court's interlocutories that Mon and Yamagata et al. propounded on the NPA. So to suggest that that information was not provided, it's just disingenuous because the question was never asked. And all of the information in the record supports the district court's conclusion that even citing Mon and Yamagata et al.'s arguments, the preponderance still was not on their side. And this involved damages against the United States, which required an unequivocal, excuse me, expression by Congress that these are the kind of damages that Congress intended the U.S. Treasury to bear. And as I explained, subsection C and subsection A of 7431 prevent that from happening. These damages are not within the statute. I don't care what they are. Ms. Hudson. Can I just clarify? You're saying that if you're going after where the third party caused the damages or an independent party, then you go under subsection 2 of the statute? Right. Subsection 2 is where the unauthorized, where the violation of 6103, and it includes actually another statute having to do with excessive organizations, but for which the United States was not liable at all. But if the 6103 violation was by someone other than a United States employee, the United States was not liable for damages. And that's where the proximate causation analysis really kind of ties this all up. And the Supreme Court's opinion in Caroline was issued relatively recently, especially in terms of the length of this case, was issued while this case was pending in the district court. And before that time, there wasn't a federal law general definition of the break as a result of. And that's the phrase that appears here at subsection C. And the Supreme Court said that after this whole process indicates causation, and it includes both factual and proximate causation, and it precludes an imposition of liability where the causal link is extremely attenuated. And in this case, the causal link is extremely attenuated. So subsection C by itself is not satisfied in terms of the critical causation. But even beyond that, the statute does not unequivocally require the imposition of damages against the United States for someone else's unlawful disclosure. The unlawful disclosure was by someone in Japan, not an IRS employee. And Marvin Yamagata's expert witness testified that his numbers were based on the damages being caused by the media reports. And the media reports were the direct result of a disclosure that was not by a United States employee. The four corners of section 7431 do not demonstrate Congress's clear intent, which is required when you're talking about charging the U.S. Treasury millions of dollars. There's no clear intent that this is what Congress intended. And even assuming arguendo that Marvin Yamagata and Alavera can get over that hurdle, the actual damage numbers weren't a necessary foundational support. Their expert assumed profit margins from which he had no support and made no independent judgment on their accuracy. You don't have the benefit of a clock there like we do in the courtroom, so I just wanted to let you know you have approximately two minutes left. Thank you. I have my phone going, but it's timed out so I can't see the clock. I understand. Thank you very much. So, essentially, there's no internal consistency. The district court weighing of the evidence is absolutely plausible. As we explained in our brief, there are other statements by Sally Warner, by the actual factual testimony by Mr. Smith, the admissions in the third amendment complaint that the NGA always viewed this matter as internal Japanese law. These are all way more than feathers on the government side of jail. I just want to ask one question on the statute. Section 1, of course, is really a waiver of sovereign impunity to write a case against the United States, which has to have a very specific waiver. And the Section 2 says it's independent of that. If somebody else released it, you could also bring a claim against them. So, I mean, if you figure out jurisdiction and sovereign immunity and everything else, you might be able to bring a claim under Section 2, but that doesn't mean you can't bring a claim under Section 1 if there is a causation that some third party did something. I don't think the two statutes need to work completely independently of each other. Now, it's just illustrative of Congress at this time. All right. Yeah. There's more to it. I'm sorry. Oh, I'm probably running out of time. I'm sorry. Let me ask you. It's an illustrative principle that this Court expressed in Miller v. United States, and it ties into the cost of accommodation requirement. And all of the elements of the statute have to be satisfied, and they definitely aren't here. And the district court's findings are facially plausible, excuse me, and therefore not clearly erroneous. And there's no problem with the district court's rationality. Judgment should be affirmed with a minor correction to recognize that, although they filed joint return under 7431, entering this alone is considered a separate tax bill. Thank you. Thank you. And you have some time for rebuttal now. Thank you, Your Honor. Let me just try to be brief and succinct here as I am at this time. First, with respect to the argument that there's some third person as the cause here, I would refer the Court to the Jones case, which is in the papers. You would call it a Jones. In higher essence, it is disclosure to that confidential informant that there's going to be a search of the oil company. The IRS is held liable in that case, which went on for about as long as this case. So a third-party argument is not one that's your whole water. The Court is exactly correct in 7431, it is a clear waiver of sovereign immunity at Part 1, Part 4a, and that's the only place that the statutory canon of strict instruction for sovereign immunity applies. Once you find that there is a clear waiver, then the only questions are the normal common law causation issues. Judge Malma asked about the 95 letter versus the 96 letter being different purposes, and we would submit, Your Honor, that the request for assistance in the San Jose, Louisiana proposal requests for assistance from a foreign government is a subset of assistance. Well, in the 1995 letter, it was really couched as the IRS will have its interests furthered. You may have reasons to have to do something with this too, but really we want your help to follow what the IRS is doing. And that was not the dinner of the proposal in 96. That was different. That was let us collaborate here for our mutual benefit. And that's both a dinner of our mutual benefit. I always agree that the image perhaps is not perfect, but this is a good suggestion that one is different from the other in a slight way in this causation. And actually, if you look at the judges that have been in this court, I'm sorry, in this case, he actually finds causation. If you look at piece 31, or DR 31, he's referring to the table at DR 11, and that's the $32 million. The $32 million is not a single number. That shows up in the table. And there's a line that has 20 men on one side and two men on the other side, rounded, and then underneath that it says for Japan, and it breaks down the royalties and commissions from $3.6 million for 91, $7 million for 92, $6.9 million for 91 for commissions, $14.5 million for 92. And the court found, and we just try to read from here, the court finds that DR 30, quote, that even if the NTA's re-characterization of that OPA's constituent was sold as non-deductible, Director Brunson's was a direct result of the SEP, and it seems likely this is true, this demonstrates causation only with respect to the other statements in the SEP concerning the commission income demand in Yamagata. Your Honor, it's a quantum entanglement. DR allowed it as the table. The commission and royalties for Japan are the same numbers exactly as for the U.S. numbers. So there's no difference between the $32 million and the numbers below that that are the components. So what the judge did all the way through from the beginning, he found everything in favor of the plaintiffs, we proved everything. We proved that the NTA reached the press. Our expert proved that press releases had an immediate negative effect on FOPG sales, on its profitability. The court found everything, but at the end it kind of went off the rails and decoupled or disentabled the components of the $32 million from the $32 million. Thank you. Thank you, Your Honor. Both in Washington, D.C. and here in the courtroom, the case just argued if Aloe Vera versus the United States is submitted. Thank you.
judges: McKeown, Bybee, Mollway